**Volume 1 of 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE
UNITED STATES; CALIFORNIA
CHAMBER OF COMMERCE;
EMPLOYERS GROUP; CALIFORNIA
HEALTHCARE ASSOCIATION;
CALIFORNIA MANUFACTURERS AND
TECHNOLOGY ASSN.; CALIFORNIA
ASSOCIATION OF HEALTH FACILITIES;
CALIFORNIA ASSOCIATION OF HOME
& SERVICES FOR THE AGING; BETTEC
CORPORATION; MARKSHERM
CORPORATION; ZILACO INC., ZILACO;
DEL RIO HEALTHCARE, INC.;
BEVERLY HEALTH & REHABILITATION
SERVICES, INC. dba Beverly Manor
Costa Mesa; INTERNEXT GROUP,
                     *Plaintiffs-Appellees,*

AMERICAN FEDERATION OF
LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS,
                     *Plaintiff-Appellant,*

AFL-CIO & WHOLESALE DELIVERY
DRIVERS; CALIFORNIA LABOR
FEDERATION, AFL-CIO,
                     *Intervenors-Appellants,*

                     v.

No. 03-55166
D.C. No.
CV-02-00377-GLT

12167

BILL LOCKYER, Attorney General,
in his capacity as Attorney
General of the State of California;
DEPARTMENT OF HEALTH SERVICES;
FRANK G. VANACORE, as the Chief
of the Audit Review and Analysis
Section of the California
Department of Health Services;
DIANA M. BONTA, Diana M. Bonta,
R.N., Dr., P.h.D, as the Director
of the California Department of
Health Services,
                                *Defendants.*

CHAMBER OF COMMERCE OF THE
UNITED STATES; CALIFORNIA
CHAMBER OF COMMERCE;
EMPLOYERS GROUP; CALIFORNIA
HEALTHCARE ASSOCIATION;
CALIFORNIA MANUFACTURERS AND
TECHNOLOGY ASSN.; CALIFORNIA
ASSOCIATION OF HEALTH FACILITIES;
CALIFORNIA ASSOCIATION OF HOME
& SERVICES FOR THE AGING; BETTEC
CORPORATION; MARKSHERM
CORPORATION; ZILACO INC., ZILACO;
DEL RIO HEALTHCARE, INC.;

No. 03-55169
D.C. No.
CV-02-00377-GLT
Central District
of California,
Santa Ana

OPINION

BEVERLY HEALTH & REHABILITATION
SERVICES, INC. dba Beverly Manor
Costa Mesa; INTERNEXT GROUP,
                    *Plaintiffs-Appellees,*

                    and

AFL-CIO & WHOLESALE DELIVERY
DRIVERS; CALIFORNIA LABOR
FEDERATION, AFL-CIO,
                        *Intervenors,*

                    v.

BILL LOCKYER, Attorney General,
in his capacity as Attorney
General of the State of California;
DEPARTMENT OF HEALTH SERVICES;
FRANK G. VANACORE, as the Chief
of the Audit Review and Analysis
Section of the California
Department of Health Services;
DIANA M. BONTA, Diana M. Bonta,
R.N., Dr., P.h.D, as the Director
of the California Department of
Health Services,
                *Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
September 12, 2003—Pasadena, California
Opinion Filed April 20, 2004
Petition for Rehearing Granted and Opinion Withdrawn
May 13, 2005
Resubmitted May 13, 2005

Filed September 6, 2005

Before: Robert R. Beezer and Raymond C. Fisher,
Circuit Judges, and Morrison C. England,* District Judge.

Opinion by Judge Beezer;
Dissent by Judge Fisher

---

*The Honorable Morrison C. England, United States District Judge for
the Eastern District of California, sitting by designation.

## COUNSEL

Suzanne M. Ambrose, Deputy Attorney General, Sacramento, California, for the defendants-appellants.

Scott A. Kronland, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, California, and Jonathan P. Hiatt, Washington, D.C., for the intervenors-appellants.

Bradley W. Kampas, Jackson Lewis LLP, San Francisco, California, Mark E. Reagan, Hooper, Lundy & Brookman, Inc., San Francisco, California, and Stephen A. Bokat, National Chamber Litigation Center, Inc., Washington, D.C., for the plaintiffs-appellees.

Daniel V. Yager, McGuiness Norris & Williams, LLP, Washington, D.C., for the amicus curiae LPA, Inc., and Maurice Baskin, Washington, D.C., for the amicus curiae Associated Builders and Contractors, Inc.

John H. Ferguson, Associate General Counsel, National Labor Relations Board Division of Enforcement Litigation, Washington, D.C., for the amicus curiae National Labor Relations Board.

## OPINION

BEEZER, Circuit Judge:

The National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., extends to employees the opportunity to render a free and informed choice about union representation. In doing so, the Act allows for robust debate of union representation issues by employers and employees alike. The question presented is whether California Assembly Bill 1889, codified at Cal. Govt. Code §§ 16645-49, ("AB 1889" or "the stat-

ute"), which bars employers from spending "state funds" on union-related speech, is preempted by the National Labor Relations Act.[1]

As we explain, the California statute chills employers from exercising their free speech rights that are explicitly protected by Congress under the National Labor Relations Act. In doing so, the statute undermines the delicate balance established by Congress as between labor unions and employers. In addition, the California statute interferes with the National Labor Relations Act's extension of exclusive jurisdiction to the National Labor Relations Board ("NLRB") for the adoption and enforcement of representation election rules.

Appellants California and the AFL-CIO vigorously defend the statute, arguing that California may spend its funds in a manner that it sees fit. The Supreme Court teaches, however, that the use of the state spending power is rarely a defense to state interference with the National Labor Relations Act. *Wisconsin Dep't of Indus., Labor, and Human Relations v. Gould,* 475 U.S. 282, 290, 290-91 (1986) (emphasizing that Congress would not have intended to allow states to interfere with the NLRA "as long as they did so through exercises of the spending power"). The California statute is regulatory in nature, and is not focused on the police power, state procurement concerns, or local economic needs. Implementation by means of the state spending power does not save AB 1889 from preemption.

---

[1]At issue in this appeal are all provisions of AB 1889, except for sections 16645.1, 16645.3, 16645.4, 16645.5, and 16645.6, which deal with state contractors and public employers. These sections are not at issue because the district court held that plaintiffs lacked standing to challenge these provisions, except for § 16645.5. *See Chamber of Commerce v. Lockyer,* 225 F. Supp. 2d 1199, 1202-03 (C.D. Cal. 2002). The parties further stipulated, and the district court agreed, that summary judgment as to § 16645.5 be denied without prejudice and that the plaintiffs' challenges to sections 16645.1, 16645.3, 16645.4, 16645.5, and 16645.6 be stayed.

We previously filed an opinion in this case, which we withdrew upon granting appellants' Petition for Panel Rehearing. *Chamber of Commerce v. Lockyer,* 364 F.3d 1154 (9th Cir. 2004), *reh'g granted and withdrawn,* 408 F.3d 590 (9th Cir. 2005). Today, we decide the matter anew, and we affirm the district court's holding[2] that the National Labor Relations Act preempts AB 1889.

I

Before addressing employers' speech rights and embarking upon a preemption analysis, we introduce and analyze the California statute at issue.

A

Section 16645.2(a) of the California statute prohibits a "recipient of a grant of state funds" from "us[ing] the funds to assist, promote, or deter union organizing." Similarly, section 16645.7(a) bars private employers who receive more than ten thousand dollars of state funds in a calendar year from "us[ing] any of those funds to assist, promote, or deter union organizing."

The statute defines "assist[ing], promot[ing], or deter[ring] union organizing" as "any attempt by an employer to influence the decision of its employees in this state or those of its subcontractors regarding . . . [w]hether to support or oppose a labor organization that represents or seeks to represent those employees . . . or [w]hether to become a member of any labor organization." Cal. Gov't Code § 16645(a). The statute prohibits *"any expense,* including legal and consulting fees and salaries of supervisors and employees, incurred for research for, or preparation, planning, or coordination of, or carrying

_____

[2]We review the district court's preemption analysis and grant of summary judgment de novo. *Bank of Am. v. City & County of San Francisco,* 309 F.3d 551, 557 (9th Cir. 2002).

out, an activity to assist, promote, or deter union organizing." § 16646(a) (emphasis added). The statute exempts several types of pro-union activities and expenses from the prohibition, including "[a]ddressing a grievance or negotiating or administering a collective bargaining agreement," "[a]llowing a labor organization or its representatives access to the employer's facilities or property," and "[n]egotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization." §§ 16647(a), (b), (d).

The statute requires burdensome and detailed record-keeping. Employers and grantees must maintain detailed records showing that none of the funds have been used for speech regarding labor relations. §§ 16645.2(c), 16645.7(c). Those records must be produced for inspection by the Attorney General upon request. *Id.* The statute presumes that, where state and non-state funds are commingled, state funds were used to assist, promote, or deter union organizing. § 16646(b). The plaintiffs aptly characterize this feature as the "commingling trap," because a mere technical failure to keep records can constitute a violation even when no state funds were actually expended. The statute requires that employers and grantees certify in advance that the state funds will not be used for speech and activities that are related to union organizing. §§ 16645.2(c), 16645.7(b).

The enforcement provisions place heavy burdens on affected employers who accept state funds. The statute renders employers and grantees liable for treble damages (i.e., the amount of state funds that were expended in violation of the statute, plus a civil penalty equal to twice the amount of those funds). §§ 16645.2(d), 16645.7(d).

The Attorney General of California, or any private taxpayer, may file a lawsuit against a suspected violator "for injunctive relief, damages, civil penalties, and other appropriate equitable relief." § 16645.8(a). The statute awards a prevailing plaintiff, and certain prevailing taxpayer intervenors,

attorney's fees and costs. § 16645.8(d). The statute does not provide for the award of any attorney's fees or costs to a prevailing employer or grantee.

## B

We conclude that the California statute, which is far from the neutral enactment that appellees contend it to be, significantly undermines the speech rights of employers related to union organizing campaigns. Under the guise of preserving state neutrality, the statute operates to impel employers themselves to take a position of neutrality with respect to labor relations, in direct conflict with employers' rights as granted by the National Labor Relations Act.

By creating exacting compliance burdens, strict accounting requirements, the threat of lawsuits, and onerous penalties, the statute chills employer speech on the merits of unionism. The potential costs of litigation, plus the threat of severe penalties threaten to effectively halt employer campaigns to defeat labor organizing activity. Similar to neutrality agreements, which are often sought by unions from employers, the California statute pushes employers to a policy of neutrality, which in turn helps facilitate union organizing. And the statute's grant of a private right of action raises the specter that unions will file suits not to recover on claims for allegedly misspent funds, but rather to obtain bargaining leverage in a labor dispute.[3] The California statute was sponsored by the California Labor Federation, AFL-CIO, and supported by a number of labor organizations. Sen. Comm. on Industrial Relations, Comm. Rep. for 1999 Cal. Assemb. B. No. 1889, 1999-00 Reg. Sess., at 1 (June 28, 2000).[4]

---

[3]As it turns out, lawsuits and the threat thereof for unions to obtain leverage in a union organizing dispute is not a mere theoretical possibility. *See* Part I.C, *infra.*

[4]The Chamber of Commerce argues that the California statute is "part of a state-by-state effort to de facto rewrite the NLRA." The State of New York was recently enjoined from enforcing a statute which is similar to AB 1889. *See Healthcare Ass'n of New York State, Inc. v. Pataki,* No. 1:03-CV-0413, 2005 WL 1155687 (N.D.N.Y. May 17, 2005).

The statute carries a false air of evenhandedness. It purports to limit employers from using state funds to either "promote" union organizing or "deter" union organizing. §§ 16645.2(a), 16645.7(a). What must be understood, of course, is that few, if any, employers will wish for their employees to vote for union representation. Rare, indeed, will the circumstance be where an employer will actually dedicate resources to encourage its employees to unionize. For this reason, the statute's prohibition on spending state funds to "assist" or "promote" union organizing is meaningless, particularly when taking into account the pro-union exceptions contained in section 16647. Hence, the overriding primary effect of the statute is focused and one-sided: to prevent the expenditure of money which seeks to "deter union organizing."

The California Teamsters telegraphed this impact of the legislation in a letter to certain members of the California legislature when AB 1889 was under consideration. The California Teamsters Public Affairs Council "urged [an] 'aye' vote on AB 1889" because it "prohibit[s] employers who receive state funds from using those funds to *discourage* unionization" and will affect the "all too common practice" of "employer campaigns to defeat labor organizing activity." (emphasis added). In addition, a law firm which represented itself as "the largest Union-side labor law firm on the West Coast" wrote in a letter to the California Attorney General that AB 1889, if not halted by a court, would "have a significant positive effect on various [union] organizing drives . . . ."

The compliance provisions are daunting. Employers must maintain records demonstrating a complete separation of state funds. These records must identify every expense at all related to a union organizing campaign, save for a few pro-union exceptions, and prove conclusively that expenditures for such purposes do not derive from state funds. §§ 16645.2(c), 16645.7(c), 16646, 16647. The statute creates a presumption that the employer used state funds for a prohibited purpose unless proven otherwise. § 16646(b). This presumption

applies even when an employer has sufficient private funds such that no state funds were actually expended. *Id.*

The documentation demands of the statute, which require employers to track every moment of employee time and every expense that somehow relates to deterring union organizing efforts, operate to inhibit employers from opposing union representation drives at all. *See* Cal. Gov't Code § 16646(a) (requiring documentation of *"any expense,* including . . . salaries of supervisors and employees, incurred for research for, or preparation, planning, or coordination of, or carrying out, an activity to . . . deter union organizing") (emphasis added). To comply with the statute and continue to exercise its free speech rights, an employer would be required to create accurate and expensive accounting and payroll systems which identify, isolate, and allocate every expenditure, no matter how small, related to assisting, promoting, or deterring union organizing. The statute's "commingling trap" ensures that a failure to allocate an expenditure correctly leads to a presumption that state funds were expended for a prohibited purpose. Unions have capitalized on these strict record-keeping provisions, threatening and sometimes taking legal action based on (often unsupported) allegations that employers have not kept adequate records demonstrating a separation of state funds. *See* Part I.C, *infra.*

Unions are authorized to commence lawsuits or to intervene in a lawsuit demanding an audit, injunctive relief, damages, and civil penalties. § 16645.8(a). With the benefit of the statute and the civil discovery process, unions are able to file a suit to pursue a fishing expedition or otherwise distract an employer during union organizing.[5] The statute allows for tre-

---

[5]In this connection, we note an additional manner in which AB 1889 alters the balance as established by Congress between labor unions and employers: AB 1889 comes dangerously close to rendering employers' financial records an open book, which federal labor law does not allow. Labor unions are permitted to receive employers' financial records under

ble damages, which further chills employer speech by creating a further disincentive to even attempt to present any adverse comment on union organizing activity in the first instance. §§ 16645.2(d), 16645.7(d).

AB 1889 might be most problematic with regard to employers and grantees who receive 100% of their revenues from the state. If AB 1889 were in effect, those employers would have no ability whatsoever to exercise their federal statutory rights to communicate their views about a union organizing effort.

Not only does the statute muster California's public funds to regulate labor relations, but it also commandeers employers' *own* money and dictates to these private employers how they shall spend their money. Private money comes into play because when a state pays an employer for goods or services, there is an amount of profit subsumed within the payment. That profit is no longer the state's money, but is ultimately transformed into the earned compensation of the employer. The California statute prohibits an employer from using even this profit to discuss the advantages and disadvantages of union organizing efforts with employees. The same difficulty with the interplay of private funds emerges with the statute's presumption that state funds have been spent on union-related expenditures, even when an employer has a commingled

the National Labor Relations Act only after winning an election and only for legitimate collective bargaining purposes. *See NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435-36 (1967); *NLRB v. Truitt Manufacturing Co.,* 351 U.S. 149, 153 (1956). Under AB 1889, however, unions are able to bypass these federal limits and file lawsuits in state court, granting them access to employers' financial records in state court. With these records in hand, the unions would have additional leverage in advocating for a unionized workforce and place additional pressure on an employer to simply recognize a given union.

account with sufficient private funds so that no public money need be actually spent.[6]

## C

The substantial record before us demonstrates that labor unions have leveraged the significant compliance burdens of the statute to enhance their bargaining position as against employers. After AB 1889 passed, unions began writing to the California Attorney General's office, alleging violations of the statute in an effort to coerce employers to abstain from distributing anti-union literature, retaining consultants and legal counsel, or otherwise communicating with employees about the advantages and disadvantages of employment in a union shop.

The record before us contains numerous threatening complaints that labor unions have sent to employers and the California Attorney General. One union wrote the Attorney General and alleged that an employer violated the statute by illegally commingling state funds. The basis for the allegation? That employees who were attending a mandatory meeting about union organizing were not paid with a separate paycheck for time that each employee spent at the meeting. Another union alleged a violation of the statute, with little factual support, but offered to "settle" the alleged violation if the employer agreed to enter into a neutrality agreement with the union. Yet another union alleged that an employer violated AB 1889 by hiring an attorney to represent it during an organizing drive without arranging to pay for these legal services from funds that were conclusively derived from a source other than the state.

---

[6]The statute would not be saved from preemption even if it did not commandeer an employer's own funds, because our decision is rooted in the statute's leverage of state funds to regulate labor relations in a manner that interferes with, and therefore is preempted by, federal law. The statute's command over an employer's own funds constitutes an independent problem with AB 1889, a problem upon which our holding does not rest.

Several lawsuits have also been filed against employers pursuant to AB 1889. In one lawsuit the California Attorney General sued Fountain View, Inc. a nursing home operator, demanding that Fountain View turn over records to demonstrate that no state funds were used in conveying its views on union organizing efforts. For good measure, the California Attorney General also demanded that the nursing home pay "attorneys' fees and costs" related to the suit.

In a different case, the Service Employees International Union, Local 399 ("Service Union"), took a very aggressive approach, deciding to sue the employer itself, AB Crispino & Company ("Crispino"), a company which also operates nursing home facilities. At the time, the Service Union was a member union of the AFL-CIO and was represented by the same legal counsel who represent appellant-intervenor AFL-CIO before us in this appeal. The Service Union alleged that the nursing home "unlawfully has used State funds to deter union organizing by its employees, and unlawfully has failed to maintain records sufficient to show that State funds were not so misused." It was not just the use of state funds that the Union alleged as a basis for the suit, but also that Crispino "co-mingled State funds and non-State funds in common accounts" and "failed to maintain records sufficient to show that it had used no State funds" with regard to the union organizing efforts. The Service Union suit further charged that the alleged violation of AB 1889 constitutes a per se violation of California Business and Professions Code § 17200, as an "unlawful or unfair business act or practice." The lawsuit demanded a number of remedies, including an injunction, an accounting of Crispino's expenses, treble damages, and restitution, together with "attorneys' fees, investigative expenses, and costs of suit." Appellant-Intervenor AFL-CIO is hardly in a position to downplay the merit of the suit against Crispino under AB 1889, because the Service Union was then affiliated with the AFL-CIO, and some of the same lawyers that represent the AFL-CIO on appeal before us filed the suit against Crispino.

The activities of the Service Employees International Union reveal that they continued to press employers who receive California government funds to unionize or else face penalties under AB 1889. One of the same lawyers who represents the AFL-CIO before us and the Service Union against Crispino, also represented Service Union, Local 250 against The Ensign Group, which operates at least one nursing home in California, referred to as the Sonoma Healthcare Center. The lawyer, representing the union, wrote to the California Attorney General, alleging that the union believed that the Ensign Group violated AB 1889 by "fail[ing] to maintain records sufficient to show that no state funds were used for its anti-union activities" and by conducting the anti-union activities from accounts where state funds were commingled. If the Ensign Group could not present adequate evidence to disprove his allegations, the attorney "request[ed] that [the Attorney General] commence a civil action against Sonoma under Section 16645.8 for injunctive relief, damages, civil penalties, and other appropriate equitable relief."

The Ensign Group, faced with the prospect of a lawsuit from either the union or the Attorney General because of the favorable status AB 1889 affords union interests, responded that the union's "accusation of improper use of State funds at Sonoma Healthcare is reckless and without factual basis." General Counsel for the Ensign Group noted his "surprise[ ] that [the union's attorney] would suggest that his client's stated but unsupported belief in these spurious allegations should be sufficient to mobilize and expend the resources of the Attorney General's Office and the State of California in this manner." What the record actually teaches is that the unions' aggressive use of AB 1889 to gain a special advantage in labor disputes, and thereby alter the balance of power between unions and employers, is no surprise at all. That the unions' use of AB 1889 has been effected by appellants themselves and their legal representatives—the State of California in the Fountain View case, and the AFL-CIO and its own lawyers in the lawsuit against Crispino and the threatened lawsuit

against The Ensign Group—undermines their arguments, made in these proceedings on appeal, that downplay the decidedly pro-union impact of the California statute.

## II

Our preemption analysis begins with the National Labor Relations Act, which protects the rights of employers and employees and provides an administrative mechanism to resolve questions concerning union representation. We hold that Section 8(c) of the National Labor Relations Act, codified at 29 U.S.C. § 158(c), explicitly protects the right of employers to express their views about unions and union organizing efforts.

## A

**[1]** Section 8(c), codified at 29 U.S.C. § 158(c), permits employers to articulate, in a non-coercive[7] manner, their views regarding union organizing efforts:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c).

**[2]** Although the National Labor Relations Act was originally enacted in 1935, Congress added Section 8(c) of the NLRA in 1947, "to protect the right of free speech when what the employer says or writes is not of a threatening nature or

---

[7]For simplicity, we refer to speech that "contains no threat of reprisal or force or promise of benefit," 29 U.S.C. § 158(c), as "non-coercive."

does not promise a prohibited favorable discrimination." H.R. Rep. No. 80-510 (1947), *reprinted in* 1947 U.S. Code Cong. Serv. 1135, 1151. The purpose of Section 8(c) was "to insure both to employers and labor organizations full freedom to express their views to employees on labor matters . . . ." S. Rep. 80-105, at 23 (1947).

The National Labor Relations Act is a comprehensive regulatory scheme governing labor relations. *See, e.g., Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383 (1969). The Act's preeminent mode of regulation operates by defining a series of prohibitions on employer and union conduct, called "unfair labor practices." *See* 29 U.S.C. § 158(a) (defining unfair labor practices if committed by employers); 29 U.S.C. § 158(b) (defining unfair labor practices if committed labor organizations). An actor who is alleged to have committed an unfair labor practice may be subject to a Board proceeding and if found to have committed an unfair labor practice, the Board may impose various remedies. *See* 29 U.S.C. § 160.

**[3]** Because the Act is a comprehensive regulatory scheme, to say that an activity is *not punishable* by the Act, which is what Section 8(c) dictates, is the equivalent of protecting that activity. Section 8(c) specifically precludes non-coercive employer speech from constituting as an unfair labor practice, or even evidence thereof. In other words, because the Act's comprehensive scheme declares non-coercive employer speech to be non-punishable, employers are free to engage in it. Non-coercive employer speech is thus protected by the Act's comprehensive regulatory scheme.

The United States Supreme Court recognizes that "the enactment of § 8(c) manifests a congressional intent to encourage free debate on issues dividing labor and management." *Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53, 62 (1966). Accordingly, a state defamation statute was partially preempted by the NLRA, to "guard[ ] against

abuse of libel actions and unwarranted intrusion upon free discussion envisioned by the Act." *Id.* at 65. The Court reiterates that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617 (1969). The Congressional enactment of § 8(c), the Court explains, in conjunction with the First Amendment, allows employers to express "any of [their] general views about unionism or any of [their] specific views about a particular union" in a non-coercive manner. *Id.* at 618.

We turn to discuss the longstanding importance of employer free speech to the National Labor Relations Act, which reinforces our holding that Section 8(c) of the Act protects non-coercive employer speech.

B

Although there are certain limits on employer speech— such as speech that is coercive or threatening—the National Labor Relations Act pivots on the notion that employers and employees may freely discuss their views about union organizing efforts.

The National Labor Relations Board has supported the congressional policy of free speech, holding "that it will not restrict the right of any party to inform employees of the advantages and disadvantages of unions and of joining them as long as such information is imparted to employees in a noncoercive manner." *Trent Tube Co.,* 147 NLRB 538, 541 (1964) (internal quotation marks omitted); *see also United Technologies Corp.,* 274 NLRB 1069, 1074 (1985) ("[A]n employer has a fundamental right, protected by Section 8(c) of the Act, to communicate with its employees concerning its position in collective-bargaining negotiations and the course of those negotiations.") (footnote omitted).

Employers have a number of tools at their disposal in exercising their Section 8(c) rights to express their views on union

organizing efforts. An employer is permitted, for example, to express its views about union representation to masses of employees, in mandatory meetings, on company time, so long as such speech does not occur within 24 hours of an election. *See Peerless Plywood Co.,* 107 NLRB 427, 429 (1953); *Livingston Shirt Corp.,* 107 NLRB 400, 409 (1953). Employers may dispatch supervisors to engage in one-on-one discussions during work time with employees about the negative effects of union representation, *see, e.g., NLRB v. Lenkurt Elec. Co.,* 438 F.2d 1102, 1107-08 (9th Cir. 1971), and may disseminate written anti-union materials, *Beverly Enterprises-Hawaii, Inc.,* 326 NLRB 335, 336 (1998) (holding that "the [e]mployer did not engage in objectionable conduct when its supervisors handed out flyers [even] at a time when the [e]mployer was enforcing its otherwise valid no-distribution rule against employees.").

**[4]** Our opinions have faithfully reiterated our "commit[-ment] to the principle that debate in union campaigns should be vigorous and uninhibited," so long as the debate is free of coercion and retaliatory threats. *Lenkurt Elec.,* 438 F.2d at 1108 (citing *N.L.R.B. v. TRW-Semiconductors, Inc.,* 385 F.2d 753, 759-60 (9th Cir. 1967)). "The exercise of free speech in these campaigns should not be unduly restricted by narrow construction. It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right." *Id.; accord, Montgomery Ward & Co. v. NLRB,* 385 F.2d 760, 763 (8th Cir. 1967) ("[T]he right of free speech guaranteed by the First Amendment and § 8(c) of the Act should not be defeated by narrow or strained construction.").

Much like modern political campaigns, union organizing campaigns are fiercely contested, but the National Labor Relations Board "has allowed wide latitude to the competing parties. It is clear that the Board does not police or censor propaganda used in the elections it conducts, but rather leaves to

the good sense of the voters the appraisal of such matters, and to opposing parties the task of correcting inaccurate and untruthful statements." *Linn,* 383 U.S. at 60 (internal quotation marks and footnote omitted); *see also Midland Nat'l Life Ins. Co.,* 263 NLRB 127, 133 (1982) ("[W]e rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements."); *NLRB v. Yellow Transp. Co.,* 709 F.2d 1342, 1343 (9th Cir. 1983) (recognizing *Midland).*

We have consistently emphasized the importance of an employer's freedom of speech in labor relations matters. "Freedom of speech is an essential component of the labor-management relationship. Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in 'uninhibited, robust, and wide-open' debate." *Steam Press Holdings v. Haw. Teamsters & Allied Workers Union, Local 996,* 302 F.3d 998, 1009 (9th Cir. 2002) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270 (1964)). For a concise and accurate statement of the rule, we have adopted the principle of free speech in union representation matters as crafted by the Fifth Circuit:

> The guaranty of freedom of speech and assembly to the employer and to the union goes to the heart of the contest over whether an employee wishes to join a union. It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available.

*NLRB v. TRW-Semiconductors, Inc.,* 385 F.2d 753, 760 (9th Cir. 1967) (quoting *Southwire Co. v. NLRB,* 383 F.2d 235, 241 (5th Cir. 1967)).

## C

Congress chose to explicitly protect non-coercive employer speech from punishment under the Act. The National Labor

Relations Act's comprehensive scheme protects non-coercive employer speech, because it is fundamental in allowing fair and free representation elections.

We turn to discuss federal preemption principles, with a keen eye toward whether the California statute interferes with employers' federally protected free speech rights on union matters.

### III

The Supreme Court's preemption doctrines as they relate to the National Labor Relations Act have long been centered around reinforcing the "purpose of the Act[, which] was to obtain 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.' " *NLRB v. Nash-Finch Co.,* 404 U.S. 138, 144 (1971) (quoting *Garner v. Teamsters Union,* 346 U.S. 485, 490 (1953)). Congressional intent is the ultimate touchstone of any preemption analysis. *Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747 (1985) (*"Metropolitan Life"*).

**[5]** The Supreme Court has articulated "two distinct NLRA pre-emption principles" as expressed in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959) ("*Garmon* preemption"), and *Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132 (1976) ("*Machinists* preemption"). *Metropolitan Life,* 471 U.S. at 748, 748-49. We analyze the doctrines in turn and hold that *Garmon* preemption and *Machinists* preemption each completely preempts the provisions of the California statute before us.

### A

The doctrine of *Garmon* preemption exists to uphold national labor policy and to vindicate Congress's decision to "entrust[ ] administration of the labor policy for the Nation to

a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." *Garmon,* 359 U.S. at 242, 246. The California statute stifles employers' speech rights which are granted by federal law, and in doing so, impedes the ability of the National Labor Relations Board to uphold its election speech rules and administer free and fair elections. We hold that AB 1889 is completely preempted under the *Garmon* doctrine.

In upholding the National Labor Relations Act from state-law dilution, the Supreme Court has emphasized the importance of "delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered." *Garmon,* 359 U.S. at 246. *Garmon* preemption is focused on avoiding "the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes." *Id.* at 242.

**[6]** There are three forms of *Garmon* preemption, depending on the status of the conduct that the state attempts to regulate: (1) where the conduct is *actually* protected or prohibited by the NLRA; (2) where the conduct is arguably prohibited by the NLRA; and (3) where the conduct is arguably protected by the NLRA. *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180 (1978). Because section 8(c) actually protects employers' speech rights in the labor relations context, the first and strongest form of *Garmon* preemption applies.

At issue in *Sears* was the power of a state court to hear a trespass lawsuit brought by an employer to enforce trespassing laws against union picketing. *Sears,* 436 U.S. at 182. All along, the *Sears* Court explicitly disclosed that it was *not* addressing a case that involved *actually* protected or prohibited conduct. *Sears,* 436 U.S. at 187 ("The case is not, however, one in which 'it is clear or may fairly be assumed' that

the subject matter which the state court sought to regulate . . . is either prohibited or protected by the Federal Act.").

The *Sears* Court, assessing at the second type of *Garmon* preemption, considered whether the picketing was *"arguably prohibited"* by federal law, which would be possible grounds for preemption. *Id.* at 190-98 (emphasis added). The Court concluded that, with regard to activity which is arguably prohibited by the Act, *Garmon* preemption (and the accompanying risk of interference with the jurisdiction of the NLRB) emerges only when "the controversy is identical to . . . that which could have been, but was not, presented to the Labor Board." *Id.* at 197. The Court concluded that the NLRB's inquiry regarding the arguably prohibited conduct would prove to be vastly different than an inquiry by the state court as to whether there was a trespass, and therefore, declined to find *Garmon* preemption.

The Court turned to the question whether the *arguably protected* character of the union's picketing could lead to *Garmon* preemption. *Id.* at 199-207. Preliminarily, the Court noted that "state-court interference with conduct actually protected by the act" invokes a "constitutional objection" rooted in the Supremacy Clause. *Id.* at 199. Therefore, "[c]onsiderations of federal supremacy . . . are implicated to a greater extent when labor-related activity is protected than when it is prohibited." *Id.* at 200. The Court concluded that even though the Union's peaceful, if trespassory, picketing could arguably be protected under the Act, such a trespass "is far more likely to be unprotected than protected." *Sears,* 436 U.S. at 205. The Court held, "the assertion of state jurisdiction [to adjudicate the alleged trespass] does not create a significant risk of prohibition of protected conduct." *Sears,* 436 U.S. at 207. Notably, with regard to the *arguably protected* conduct of the picketing and trespass, the Court did *not* require (as it did with respect to *arguably prohibited* conduct) that the controversies before the NLRB and state court be identical before invoking *Garmon* preemption.

**[7]** The strongest form of *Garmon* preemption applies to activity which is *actually* protected or prohibited by federal law. AB 1889, in view of Section 8(c) of the NLRA and its actual protection of speech rights of employers, invokes this strongest form of *Garmon* preemption, which dictates:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by [the National Labor Relations Act,] due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.

*Garmon,* 359 U.S. at 244 (quoted in *Sears,* 436 U.S. at 187 n.11). AB 1889 encumbers federally protected speech rights, and in doing so, interferes with the jurisdiction of the National Labor Relations Board.

Congress has directed the National Labor Relations Board to oversee elections and determine what conduct constitutes an unfair labor practice under the Act. *See* 29 U.S.C. § 158(a)(1). Broadly speaking, and consistent with section 8(c) of the National Labor Relations Act, the NLRB takes a *laissez faire* approach to employee and employer speech, allowing passionate, partisan debate to proceed during a union organizing campaign. *See Trent Tube Co.,* 147 NLRB 538, 541 (1964). At the same time, the NLRB has jurisdiction to regulate a certain bandwidth of employer speech, to ensure compliance with § 8(c). *See Midland Nat'l Life Ins. Co.,* 263 NLRB 127, 133 (1982) "[W]e will no[t] probe into the truth or falsity of the parties' campaign statements, and [ ] will not set elections aside on the basis of misleading campaign statements . . . . [But] we will continue to protect against other campaign conduct, such as threats, promises, or the like, which interferes with employee free choice."). For example,

the NLRB has long enforced various "time, place, and manner" rules that bar certain types of campaign and speech activities in the vicinity of the polls or in the final hours before an election. *See Peerless Plywood Co.,* 107 NLRB 427, 429-30 (1953); *Milchem, Inc.,* 170 NLRB 362, 362-63 (1968). The NLRB has held that, consistent with § 8(c), employers may hold mandatory meetings with employees about union organizing efforts, *see Livingston Shirt Corp.,* 107 NLRB 400, 409 (1953), direct supervisors to informally discuss a representation campaign with employees, *see Stanley Oil Co.,* 213 NLRB 219, 225 (1974), and distribute anti-union literature to employees even when enforcing a no-solicitation rule to employees, *Beverly Enterprises-Hawaii,* 326 NLRB 335, 336 (1998).

**[8]** The California statute regulates and discourages the same partisan employer speech that Congress committed to the jurisdiction of the National Labor Relations Board. In doing so, AB 1889 discourages employer speech, which works at cross-purposes with the relaxed election speech rules as established by the NLRB. It was to the NLRB that Congress "entrusted . . . a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330 (1946). By discouraging employer speech, California directly usurps the ability of the National Labor Relations Board to administer elections that will foster fair and free employee choice.

Far from hewing to the NLRA's goal of installing a "national labor policy of minimizing industrial strife," *Emporium Capwell Co. v. W. Addition Cmty. Org.,* 420 U.S. 50, 62 (1975), AB 1889 encourages additional litigation by allowing unions and the California Attorney General to bring proceedings in state court to attack an employer who engages in the very partisan employer speech that the National Labor Relations Board protects.

California impairs employer speech on the merits of union organizing activity despite the NLRB's permissive policy on employer speech. California defies Congress's decision to "entrust[ ] to the Board alone" the criteria necessary to conduct a fair representation election. *NLRB v. Waterman S.S. Corp.,* 309 U.S. 206, 226 (1940).

**[9]** We observe that *"Garmon* preemption is 'intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA.' " *Alameda Newspapers, Inc. v. City of Oakland,* 95 F.3d 1406, 1412 (9th Cir. 1996) (quoting *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 613 (1986)); *see also Gould,* 475 U.S. at 286-87, 288-89 (1986). California's displacement of the NLRA's free speech protections and its interference with the National Labor Relations Board render AB 1889 preempted under *Garmon.* In other words, *Garmon* preemption applies because AB 1889 "regulate[s] conduct so plainly within the central aim of federal regulation [that it] involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law," thus creating a "potential frustration of national purposes." *Garmon,* 359 U.S. at 244.

B

**[10]** The doctrine of "*Machinists* pre-emption preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." *Bldg. and Constr. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.,* 507 U.S. 218, 226 (1993) ("*Boston Harbor*") (internal quotation marks omitted). Although cast nominally as an effort to ensure state neutrality, the California statute, by discouraging employers from exercising their protected speech rights, operates to significantly empower labor unions as against employers. In doing so, the California statute runs

roughshod over the delicate balance between labor unions and employers as mandated by Congress through the National Labor Relations Act. For this reason, AB 1889 is preempted by the National Labor Relations Act, pursuant to *Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132 (1976).

Machinists preemption "is based on the premise that 'the use of economic pressure by the parties to a labor dispute is . . . part and parcel of the process of collective bargaining,' " which means that "neither a state nor the National Labor Relations Board is 'afforded flexibility in picking and choosing which economic devices of labor and management shall be branded unlawful.' " *Alameda,* 95 F.3d at 1413 (quoting *Machinists,* 427 U.S. at 144, 149).

Under the doctrine of *Machinists* preemption, a state cannot "deny[ ] one party . . . a weapon that Congress meant him to have available," because such a state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Machinists,* 427 U.S. at 150, 151 (internal quotation marks omitted).

Preemption will prevail over the application of local law even when federal law does not expressly protect the conduct at issue if "the application of state law . . . would operate to frustrate the purpose of the federal legislation." *Teamsters v. Morton,* 377 U.S. 252, 258, 260 (1964) (noting also that a conflicting state law cannot be permitted to "frustrate the congressional determination to leave th[e] weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy."). *Machinists* affirms this notion, holding that "a particular activity might be protected by federal law not only when it [is explicitly protected by the NLRA], but also when it was an activity that Congress intended to be unrestricted by [a]ny governmental power to regulate." 427 U.S. at 141 (internal quotation marks omitted).We are dealing not with an activity

one speculates that Congress might protect, but rather, employer speech that Congress has explicitly protected.

**[11]** Drawing upon our conclusions and observations in Part I, *supra,* we conclude that AB 1889 alters the balance of power between labor unions and employers and thus falls prey to *Machinists* preemption. In infringing the speech rights of employers, the statute substantively regulates and disrupts "Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." *Boston Harbor,* 507 U.S. at 226 (internal quotation marks omitted). The statute frustrates "effective implementation of the [National Labor Relations] Act's processes," rendering preemption of the California statute under *Machinists* appropriate. *Machinists,* 427 U.S. at 148 (internal quotation marks omitted). An essential structural component of the union organizing process as established by the National Labor Relations Act is the ability of management to communicate its views on the merits of unionism, an attribute that AB 1889 disrupts.

## C

**[12]** After we filed our first opinion, now withdrawn, appellant-intervenor AFL-CIO argued that we should consider preempting the penalty and enforcement provisions, but leave the core spending prohibition of AB 1889 intact. *See Dalton v. Little Rock Family Planning Servs.,* 516 U.S. 474, 476 (1996) (internal quotation marks omitted) ("In a pre-emption case such as this, state law is displaced only to the extent that it actually conflicts with federal law."). We conclude that partial preemption is not proper, because our *Garmon* and *Machinists* analyses demand preemption of AB 1889's core spending restrictions.

The AFL-CIO argues that "[t]he core restrictions on spending state funds can operate independently of the penalty and private enforcement provisions, for the Attorney General

would still have authority to enforce those restrictions like any other grant or contract terms." AFL-CIO Pet. for Rehearing at 16. In other words, under the AFL-CIO's vision as to how the statute could be severed[8] and saved from preemption, employers would still be required to avoid spending state funds on union organizing, and the Attorney General alone would be able to enforce the spending restrictions.

Of course, *someone* would be empowered to enforce even the most generic requirement that state funds not be spent on discouraging union organization. This fact, along with the AFL-CIO's argument that the Attorney General would still be able to enforce the statute, actually underscores the reasoning underlying our holding that the statutory provisions at issue are completely preempted. No matter whether the Attorney General or the unions initiate the enforcement proceedings, the balance of power as between labor unions and employers would still be improperly disturbed. Even under the limited version of AB 1889 that the AFL-CIO proposes, any time an employer who receives state funds speaks about the merits of union organizing, it would risk being accused of misspending state funds and could be subjected to an investigation by the Attorney General or a lawsuit brought by the Attorney General. And as they have already done, the unions would still be empowered to press the Attorney General to investigate alleged claims of misuse of state funds, thus further deterring employer free speech about union organizing. In addition, employers who engage in union organizing-related speech would need to maintain records showing that it did not spend state funds on such activity. This need to keep records would dissuade some employers from engaging in union-related speech at all. These substantial disincentives to employer speech of even a limited version of AB 1889 would disrupt

---

[8]We need not decide whether the statutory provisions of AB 1889 are severable in the first instance, because even if certain provisions of the statute are severable, none of the statutory provisions before us survives our preemption analyses.

the federally imposed balance of power between labor unions and employers and interfere with the speech rules as enforced by the National Labor Relations Board.

We also note that severing the private enforcement provisions of AB 1889 will not successfully prevent labor unions from suing, under California law, to enforce a core restriction on the use of state funds. The union in the Crispino case, for example, based a cause of action in its lawsuit that did not rely on AB 1889's private enforcement provision. The union alleged that Crispino's misuse of state funds gave the union a cause of action for injunctive relief and restitutionary relief on behalf of the State of California. The union justified the cause of action by casting the alleged misuse of funds as a per se violation of California Business and Professions Code § 17200, as an "unlawful or unfair business act or practice." *See* Cal. Bus. & Prof. Code § 17204 (authorizing a civil action for an alleged violation of Cal. Bus. & Prof. Code § 17200 "by any person who has suffered injury in fact and has lost money or property as a result").

**[13]** We emphasize that AB 1889 is a regulatory enactment and a non-neutral one at that, benefitting labor unions as against employers. The statute's total preemption in no way hinges on the statute's enforcement and penalty provisions. Even if we were to delete the private enforcement provisions, the penalty provisions, and the commingling trap, still remaining at the very least is the problematic core of the statute. The core of AB 1889 places employers who receive state funds at risk of violating state law when they attempt to express their views about union organizing. The very core of AB 1889 interferes with an employer's protected federal right to express its views on union organizing, rendering *Garmon* and *Machinists* preemption appropriate.[9]

---

[9]The substantial record before us has been generated over the course of three years of litigation. In addition to the substantial documentation that was generated before the district court, along with the district court's well-

IV

AB 1889 is a regulatory measure subject to preemption analysis and we conclude that the California statute is not saved from preemption by asserted local interests. We reject appellants' argument that the statute should be saved from preemption because California is simply attempting to control the use of its own funds.

A

California and the AFL-CIO argue that AB 1889 is not subject to preemption because the statute is not regulatory in character, but instead these parties consider the state to be a mere "market participant." *See Alameda Newspapers Inc. v. City of Oakland,* 95 F.3d 1406, 1413 (9th Cir. 1996) ("A prerequisite to preemption [under the NLRA] is a finding that the state or local action in question constitutes *regulation* of labor relations between employers and employees."). We conclude that AB 1889 is regulatory and that the market participant exception to NLRA preemption does not apply.

**[14]** *Boston Harbor* is the seminal case outlining the market participant exception to preemption under the National Labor Relations Act. 507 U.S. 218 (1993). *Boston Harbor* holds that a state agency acted as a market participant when it required contractors working on a clean-up of the Boston Harbor to agree to the terms of a project labor agreement. The Court notes that the agency's actions were proprietary, not regulatory and explains that the agency's actions were taken with respect to this "one particular job," in an effort to "ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id.* at 232.

reasoned decision, we have the benefit of at least ten appellate briefs from at least five different parties, not to mention a previous opinion of our own, all of which sufficiently informs our holding that AB 1889 is preempted in its entirety. We conclude that a remand is not necessary.

**[15]** By contrast, *Wisconsin Department of Industry, Labor, and Human Relations v. Gould,* 475 U.S. 282 (1986), strikes down a Wisconsin statute that barred recurring labor law violators from doing business with the state. Wisconsin argued that its statute should escape preemption because it acted through its spending power rather than its regulatory power. The Court found this to be a "distinction without a difference." *Gould,* 475 U.S. at 287. Wisconsin was not acting as a market participant, the Court held, because Wisconsin "simply is not functioning as a private purchaser of services." *Id.* at 289 (internal quotations omitted). The Court held the statute to be "tantamount to regulation." *Id.* at 289. The Court explained that it "cannot believe that Congress intended to allow States to interfere with the 'interrelated federal scheme of law, remedy, and administration' under the NLRA as long as they did so through exercises of the spending power." *Id.* at 290 (quoting *Garmon,* 359 U.S. at 243) (citation omitted); *see also id.* (noting that because "government occupies a unique position of power in our society, [ ] its conduct, *regardless of form,* is rightly subject to special restraints") (emphasis added). Because California through AB 1889 seeks to shape the overall labor market in a pervasive, nonproprietary manner, the statute is regulatory, and far removed from the market participant exception. *See Cardinal Towing & Auto Repair, Inc. v. City of Bedford,* 180 F.3d 686, 693 (5th Cir. 1999) (concluding that to establish the market participant exception, the challenged action must "essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances" and must have a "narrow scope . . . [to] defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem.").

**[16]** The statute applies broadly to employers and grantees who accept state funds, across countless industries, employers, and grantees. The statute is not tailored to govern in any particular setting. Further, the statute, similar to that at issue

in *Gould,* is not focused on California's proprietary interest in efficiently procuring goods and services, but instead seeks to broadly color the state's impact on labor relations between employees and prospective labor union representatives. The statute sweeps broadly in impacting the labor relations of grantees and employers who enter contracts for furnishing goods or services to be paid for by the state treasury. We conclude that AB 1889 is a regulatory measure and thus does not elude NLRA preemption through the market participant exception.

### B

**[17]** It is for many of the same reasons that we cannot accept the AFL-CIO's argument that AB 1889 falls under the local-interest exception to *Garmon* preemption. The local-interest exception exempts from preemption state regulation of activity that "touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon,* 359 U.S. at 244. *See also Sears,* 436 U.S. at 188 n.13 (outlining several exceptions to *Garmon* preemption). Regulating employer speech in the labor relations context, which we hold that AB 1889 does, is not a traditional state interest, nor is it "so deeply rooted in local feeling and responsibility" as to invoke the exception.

**[18]** This local-interest exception encompasses "the traditional law of torts, [ ] conduct marked by violence and imminent threats to the public order." *Garmon,* 359 U.S. at 247. The Supreme Court explained that in these instances, our system of federalism and the "compelling state interest . . . in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." *Id.* The Supreme Court has also allowed states to adjudicate tort claims involving malicious libel that causes damage pursuant to this exception. *Linn,* 383 U.S. at 62.

**[19]** The California statute neither addresses tort claims such as those involving libel or defamation, nor relates to violent conduct or threats to public tranquility. Appellants cite no authority demonstrating that the Supreme Court has applied this exception to *Garmon* preemption simply because the state's spending power is invoked as the tool for the state's regulation.

Appellants elevate the statute's use of state funds to talismanic status, as if the employment of state funds forgives the statute's interference with the federal National Labor Relations Act. We do not agree. The Court in *Gould* rejected precisely the argument that a state's use of its spending power is sufficient to save it from preemption. In *Gould,* the Court held that the Wisconsin statute was preempted, even though the state's spending power was at issue. 475 U.S. at 287. Emphasizing that Congress would not have intended to allow a state to overtake the statutory scheme of the NLRA simply because the state was using its spending power, *Gould* noted that "it is far from unusual for federal law to prohibit states from making spending decisions in ways that are permissible for private parties." *Id.* at 290. The question of federal preemption does not ask us to "balance" state and federal interests, but rather, to determine whether Congress intended to preempt conflicting state law pursuant to the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI.; *Metropolitan Life,* 471 U.S. at 747.

**[20]** *Gould* holds out hope that "some state spending policies" might invoke the local interest-exception, such as those which involve "exercises of the police power" or those that can "plausibly be defended as a legitimate response to state procurement constraints or to local economic needs." *Id.* at 291. AB 1889 does not call into play the police power, state procurement constraints, or local economic needs. The statute is a simple, straightforward attempt to deter employers from communicating its views in labor relations matters. As such,

it is not saved from preemption by the local-interest exception.

We hold that neither the market participant exception nor the local-interest exception to preemption applies.

V

California and the AFL-CIO argue that preemption should not apply because they cast the challenge to the statute as a facial, rather than an as-applied, challenge. Second, California and the AFL-CIO point to First Amendment doctrines and permissible limitations on Federal Grant Programs in arguing that the statutes should not be preempted. We address each argument in turn and conclude that none of these principles prevents preemption.

A

**[21]** The AFL-CIO argues that this appeal is a facial, rather than an as-applied, challenge, and on this basis argue that plaintiffs must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987). The Chamber of Commerce contends that this case presents an as-applied challenge, because the question is whether the statute is invalid as to all employers covered by the NLRA. We hold that the categorical nature of NLRA preemption renders this debate (as to whether the challenge to an allegedly preempted statute is facial) an inconsequential one.

Appellants cite no NLRA preemption cases where a court has applied the *Salerno* standard. The absence of such cases is for good reason. The threshold question with regard to the doctrine of *Machinists* preemption does not address whether a state law's application to a particular set of facts is permissible, but rather, whether the state has impermissibly regulated in a zone that Congress has intended to be "free from all regu-

lations." *Boston Harbor,* 507 U.S. at 226. Similarly, in *Garmon,* the Court emphasized that our concern lies "with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration." 359 U.S. at 242. We are "preclude[d]" from conducting "an ad hoc inquiry" as to the effects of state regulation in a particular factual situation, because "[o]ur task is confined to dealing with classes of situations." *Id.* In other words, we take a categorical, not a piecemeal, approach to NLRA preemption.

**[22]** The categorical approach to NLRA preemption precludes the prospect of finding some circumstances in which a statute is preempted and others where it survives. The all-or-nothing stakes of NLRA preemption renders the inquiry under *Salerno* moot, because once preemption is called for, the categorical nature of this conclusion automatically commands that "no set of circumstances exists under which the [statute] would be valid." *Salerno,* 481 U.S. at 745. We hold that our preemption analysis by definition slices through the *Salerno* standard, and any dispute as to whether plaintiffs' challenge to the statute is facial is moot and need not be decided.

B

Appellants draw upon First Amendment jurisprudence, first noting that a legislature's refusal to subsidize protected speech does not offend the First Amendment, and then suggesting that AB 1889 be subject to a traditional First Amendment analysis. Among other cases, they point to *Rust v. Sullivan,* 500 U.S. 173 (1991), where the Supreme Court held that the federal government does not violate the First Amendment by prohibiting the use of federal funds in programs in which abortion is a method of family planning. *See also Lyng v. Automobile Workers,* 485 U.S. 360 (1988)*; Regan v. Taxation without Representation,* 461 U.S. 540 (1983).

The question before us, however, is not whether AB 1889 is consistent with the First Amendment. The operative ques-

tion before us *is whether the California statute is preempted by federal labor law.* As we have explained, the detailed doctrines of *Garmon* and *Machinists* preemption have emerged to test whether a given enactment is preempted by the National Labor Relations Act. We find no basis to cast aside well-established preemption lines of analysis in favor of a doctrine grafted from cases that involve pure federal Constitutional challenges.

Even if AB 1889 would pass muster under the First Amendment, the question remains whether AB 1889 survives under the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI. That, of course, is the ultimate inquiry of the preemption analysis: Whether federal law, as established in the National Labor Relations Act, preempts AB 1889. We apply the appropriate doctrines of preemption, answer in the affirmative, and that ends the matter. *See* Part III, *supra.* Appellants' proffered First Amendment cases (like *Rust v. Sullivan)* have no relevance to our Supremacy Clause-related inquiry.

C

Appellants rely on several *federal* statutes that limit employers' use of specific *federal* grant or program funds to advocate for or against union organizing. *See* Workforce Investment Act, 29 U.S.C. § 2931(b)(7) (providing that "[e]ach recipient of funds . . . shall provide to the Secretary assurances that none of such funds will be used to assist, promote, or deter union organizing."); National and Community Service State Grant Program, 42 U.S.C. § 12634(b)(1) ("Assistance provided under this subchapter shall not be used by program participants and program staff to . . . assist, promote, or deter union organizing"). These statutes are similarly unavailing in altering our inquiry under the Supremacy Clause.

Federal preemption principles do not apply to possible conflicts between two federal statutes. *Chao v. Bremerton Metal*

*Trades Council, AFL-CIO,* 294 F.3d 1114, 1119 (9th Cir. 2002). Congress has the authority to impose certain restrictions where it sees fit. Further, the federal statutes at issue apply to only a few discrete areas of federal spending and are narrow in scope. These federal statutes are far removed from allowing us to infer an overriding congressional intent to permit the State of California to intrude into the union organizing process, and the nationwide operation of the National Labor Relations Act, through AB 1889.

## VI

**[23]** We hold that Section 8(c) of the National Labor Relations Act explicitly protects the free speech rights of employers in the labor relations context and conclude that the National Labor Relations Act, and the accompanying doctrines of *Garmon* and *Machinists* preemption, completely preempt the California statutory provisions at issue with respect to any employer who is subject to regulation by the National Labor Relations Act.

AFFIRMED.

**Volume 2 of 2**

FISHER, Circuit Judge, dissenting:

This case requires us to balance two important governmental interests: the ability of states to control the use of their own funds, and the federal government's national labor policy. The majority's critical error is in failing to recognize our responsibility to honor both of these interests to the extent possible — instead, it gives short shrift to California's sovereignty interests through an overbroad application of federal labor preemption doctrine that conflicts with both our past precedent and that of the Supreme Court. The majority's preemption analysis subverts important federalism principles, and therefore I must respectfully dissent.

I agree with many — although not all — of the majority's characterizations of the complex labor preemption doctrine upon which this case turns. My main difference is in how I answer the question upon which the fate of AB 1889 turns: if a state allows employers to spend their *own* funds, in whatever manner they please, to advocate for or against unionization, does national labor preemption doctrine require the full preemption of a restriction on the use by employers of *state funds alone* for such purposes? I think not. As the Supreme Court has recognized, the State of California has the right to restrict the use of its own funds; and a more nuanced applica-

tion of labor preemption law reveals that although certain parts of the statute may be preempted, its core restriction should survive.

"We are reluctant to infer preemption," *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993) ("*Boston Harbor*"), and any analysis of preemption begins with the "basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).The majority concludes that AB 1889 is wholly preempted under both the *Garmon* and *Machinists* strands of labor preemption doctrine, so I will separately explain why neither conclusion is correct. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959); *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) ("*Machinists*"). However, although the two doctrines require different analyses, the majority misses a fundamental truth that explains why neither doctrine requires the preemption of AB 1889. As the Supreme Court has explained in a related context, and as logic dictates, when a state restricts merely the use of state funds for a given activity — without regulating an employer's ability to pursue that activity with its own funds — the state is not directly regulating that activity. Because both the *Garmon* and *Machinists* preemption doctrines share a predicate inquiry into what activity is being regulated, the fact — ignored by the majority — that California is not actually regulating the speech at issue precludes full preemption under either doctrine.

## I.   AB 1889 Is Not Preempted Under *Garmon*

*Garmon* preemption arises when there is an actual or potential conflict between state regulation and federal labor law — when a state regulates activity that is actually or arguably protected or prohibited by the NLRA. *Garmon*, 359 U.S. at 244.

The majority concludes that AB 1889 is preempted because it regulates activity that is actually protected by the NLRA.

First, employer union-related speech is not *actually protected* by the NLRA, but rather protected by the First Amendment, and therefore simply left *unregulated* by the NLRA. AB 1889 is therefore properly analyzed under the *Machinists* strand of labor preemption doctrine. Second, AB 1889 does not actually regulate such activity in any case. Third, were I wrong about both of these conclusions, AB 1889 would still not be preempted under *Garmon*.

A.   *The NLRA Does Not "Actually Protect" Employer Speech*

The majority concludes that the NLRA actually protects employer free speech rights — that it affirmatively grants protection to employers' speech on unionization. An examination of the structure and text of the NLRA demonstrates that the majority has misread it.

Section 7 of the Act is entitled "Right of employees as to organization, collective bargaining, etc." 29 U.S.C. § 157. It identifies areas of protected employee conduct, and can fairly be characterized as setting forth those employee practices that are actually protected by the NLRA. Section 8, conversely, is entitled "Unfair Labor Practices." 29 U.S.C. § 158. By its plain terms, it sets forth activities that are actually prohibited by the NLRA. It is easy to see how both Sections 7 and 8, then, can be implicated in a *Garmon* preemption analysis: if a state regulates employee activities that are actually protected under Section 7, or activities by either employers or labor unions that are actually prohibited under Section 8, that regulation will be preempted.

The majority, however, has a novel view of Section 8's third subsection, which is entitled "Expression of views without threat of reprisal or force or promise of benefit." 29

U.S.C. § 158(c). This subsection has been termed the "free speech" exemption to Section 8's definition of unfair labor practices, because it carves out noncoercive speech from the category of actually prohibited activity. From this statutory structure, the majority concludes, "[w]e hold that Section 8(c) of the [NLRA] . . . explicitly protects the right of employers to express their views about unions and union organizing efforts." Maj. Op. at 12185. This is simply wrong, explaining why this circuit has never so held, requiring the majority to do it now, so late in the day. *See, e.g., Hotel Employees, Restaurant Employees Union, Local 2 v. Marriot Corporation*, 961 F.2d 1464, 1470 n.9 (9th Cir. 1992) ("[S]ection 8(c) merely states an employer does not commit an unfair labor practice by expressing its views regarding unionization."); *UAW-Labor & Employment & Training Corp. v. Chao*, 325 F.3d 360, 364-65 (D.C. Cir. 2003) ("Fitting a *Garmon* claim under the language of § 8(c) is awkward . . . . [T]he activities described in § 8(c) . . . are not 'protected *by*' the NLRA, except from the NLRA itself.") (emphasis in original).

The majority sets forth no textually grounded explanation for its conclusion that one section of the Act, entitled "Unfair Labor Practices," actually grants an affirmative right, and instead offers only misleading quotations from legislative history and caselaw. Again and again, the majority cites references to employers' "right of free speech." *See, e.g.,* Maj. Op. at 12185. But there is no mystery about the actual source of this right. It is the First Amendment. When Congress passed the NLRA and set forth a list of prohibited actions, it saw fit to clarify that noncoercive speech — the sort protected by the First Amendment — did not constitute an unfair labor practice. Indeed, without such a qualifier, the constitutionality of the NLRA might well have been at issue.[1] The majority's

---

[1]Amicus curiae the National Labor Relations Board ("NLRB") — the very entity whose primary jurisdiction over labor related issues is protected by *Garmon* — makes no such claim as to 8(c)'s supposed affirmative grant of speech rights. *See NLRB Amicus Brief* at 4, 21-26 (echoing interpretation of the Act offered above, and noting Section 8(c)'s "exemption" for noncoercive speech).

authorities never go any further than explaining that employer speech is a necessary part of healthy labor relations. The majority seeks to use these broad platitudes to support its illogical reading of the NLRA, in order to identify an "actually protected right" in the Act itself.

This is not to say that there is no preemption issue here — it is just that it is best understood as a *Machinists* issue, not a *Garmon* issue. As I shall illustrate below, *Machinists* preemption is the more appropriate doctrine under which to evaluate AB 1889, because the arguable impermissible effects of AB 1889 are on activities meant to be left *unregulated* by the NLRA, not because of any direct conflict with the protections and prohibitions of the Act.[2]

B. *Even If AB 1889 Arguably Protects Employer Speech Rights, Garmon Preemption is Inappropriate*

It should be clear that Section 8(c) does not definitely protect employer speech rights; even if one were to disagree with my reading of the NLRA, one would have to grant that these two alternative readings present an unresolved conflict in our circuit. Let us assume, then, that AB 1889 *arguably* protects employer speech rights. Nonetheless, Supreme Court precedent shows that *Garmon* preemption is not appropriate here.

1. *The Local Interest Exception*

The Supreme Court has cautioned that "inflexible application of [the *Garmon*] doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not

---

[2]Even if one were to disagree with my reading of Section 8(c), I explain below in the *Machinists* analysis how AB 1889 does not directly regulate employer speech in any case — meaning that even if Section 8(c) *did* grant employer speech rights, AB 1889 would not be preempted under *Garmon* because it does not regulate such speech. *See infra* Section II.

threaten undue interference with the federal regulatory scheme." *Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290, 302 (1977). When conducting a *Garmon* preemption inquiry into whether regulation overlaps with NLRB jurisdiction, we must therefore conduct "a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation." *Id*. at 300. This is to avoid preempting state regulation of conduct that involves "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we [cannot] infer that Congress ha[s] deprived the States of the power to act," or where "the activity regulated [is] a merely peripheral concern" of the NLRA. *Garmon*, 359 U.S. at 243-44; *see Belknap, Inc. v. Hale*, 463 U.S. 491, 498 (1983).

The previously recognized exceptions to *Garmon* preemption have involved exercises of state court jurisdiction over universally recognized common law torts, rather than, as here, the exercise of a state's spending power. *See, e.g., Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 62 (1966) ("[A] State's concern with redressing malicious libel is 'so deeply rooted in local feeling and responsibility' that it is not preempted despite arguable overlapping NLRB jurisdiction over the speech at issue.") (quoting *Garmon,* 359 U.S. at 244). But the logic that compelled the Supreme Court to recognize the exception in the former category applies just as powerfully — if not more so — to local spending decisions. A state's control of its own purse strings is of at least as great concern to it as its power to regulate defamatory speech or trespassing. Just as the state has a responsibility to protect its citizens from such torts, so it has a responsibility and a right to spend its treasury — largely generated from the pockets of its citizens — based on principles and guidelines that the democratically elected legislature of that state deems to be appropriate. Such spending decisions are, of course, subject to federal supremacy concerns. But the Supreme Court has commanded us to be extremely cautious

before concluding that a federal regulatory scheme is meant to intrude upon such a fundamental state prerogative.

The majority gets the denominator wrong when it concludes that "regulating employer speech in the labor relations context . . . is not a traditional state interest, nor is it 'so deeply rooted in local feeling and responsibility' as to invoke the exception." Maj. Op. at 12202. The majority ignores the broader state interest at issue — control over its own fisc — and inappropriately second-guesses the California legislature's motivations in exercising this prerogative. In an era of tightening budgets, where many important competing interests vie for every dollar of a state's treasury, it is all the more important that states retain their right to determine the best way to allocate their scarce resources. Today, the majority effectively forces California to fund employers' union-related expression with those scarce dollars.

> 2. *The Supreme Court's Refinement of* Garmon *in* Sears

In *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180 (1978), the Supreme Court refined its *Garmon* preemption doctrine in the context of an employer's common law trespassing suit against picketing union members where the picketing was "arguably — but not definitely — prohibited or protected by federal law." *Sears*, 436 U.S. at 182. *Sears* divided the inquiry into two related but distinct questions: whether the state court's jurisdiction over the trespassing claim was preempted (1) by the arguably *prohibited* nature of the picketing, or (2) by its arguably *protected* nature.

As to whether the union's picketing was arguably prohibited by the NLRA, *Sears* articulated a relatively straightforward "primary jurisdiction" test: if the claim considered by the state tribunal is identical to one that could be presented to the NLRB, the state's jurisdiction is preempted. *Id.* at 197,

201; *see also Belknap*, 463 U.S. at 511 (applying primary jurisdiction test to state regulation of arguably prohibited conduct). As to whether the picketing was arguably protected by the NLRA, the Court went beyond the primary jurisdiction test to address additional federal supremacy concerns — whether, despite the lack of identicality between issues the state court and NLRB might consider, preemption was warranted to protect against the risk of "misinterpretation of [the NLRA] and the consequent prohibition of protected conduct." *Sears*, 436 U.S. at 203. We employed this "primary jurisdiction plus" approach in *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 786 (9th Cir. 2001) (holding that state jurisdiction over claims by union members against employer for false arrest, false imprisonment and malicious prosecution were not preempted under *Garmon*).[3]

### a. *Primary Jurisdiction*

The parties do not dispute that the NLRB has no interest in resolving the central controversy that a state court would have to resolve in enforcing AB 1889 — whether state funds were used to "assist, promote, or deter union organizing." The focus of a lawsuit under AB 1889 would not be on whether employer speech was proper or improper, but on whether state funds were used to support that speech. Far from being identical to the kind of question the NLRB might consider, a suit under the California statute would be an accounting for the employer's possible misuse of funds, with no attention at all to the nature of the advocacy itself.

The Chamber of Commerce makes two arguments in response. It first argues that a state court enforcing AB 1889 would in some instances have to determine whether a union was a "labor organization" under § 16647, an area that it

---

[3]In *Radcliffe*, defendants argued that "the validity of plaintiffs' claims . . . turns on whether the union activities carried on by the plaintiffs were . . . protected by § 7 of the NLRA." *Id.* at 785.

claims is reserved to the NLRB under *Marine Engineers Beneficial Ass'n v. Interlake Steamship Co.*, 370 U.S. 173 (1962). But even if the state court had to make such a determination, it would be relevant only to the ultimate question of whether an employer spent state funds on advocacy, not whether the advocacy violated the NLRA. We have previously rejected an argument that the incidental determination by a state court of whether persons were engaged "in lawful union activity" was sufficient to create *Garmon* preemption, where the focus of a state proceeding was on "state concerns of accommodating such union activity with the state-law rights of private property." *Radcliffe*, 254 F.3d at 786. Moreover, AB 1889 is not comparable to the Minnesota statute at issue in *Marine Engineers*, under which a state law determination that certain groups were not labor organizations permitted the state court to regulate picketing and other activities identical to those that could have been raised before the NLRB. *Marine Engineers*, 370 U.S. at 176.

The Chamber of Commerce also argues that because AB 1889 restricts an employer's ability to "influence" its employees using state funds, *see* § 16645(a), California courts would effectively be deciding whether employers had improperly acted under § 8(a) of the NLRA "to restrain or coerce employees in the exercise of the rights contained in [§ 7 of the NLRA]." 29 U.S.C. § 158(a) (NLRA § 8(a)). However, were the NLRB to consider an unfair labor practice charge arising from the employer's conduct, it would focus on whether the employer had interfered with the employees' § 7 rights, regardless of whether the employer used state funds in the process. Under AB 1889, the California court would be determining only whether an employer used state funds for any attempt whatsoever to influence employees, not whether that attempt violated the NLRA. Thus, because the statute is focused only on control over the use of state funding, there is

no identicality of claims, and the primary jurisdiction test is not met.[4]

## b.   *Additional Supremacy Concerns*

Because of the arguably protected character of the speech at issue, we would next assess whether the state statute is preempted because Congress would "prefer[ ] the costs inherent in a jurisdictional hiatus to the frustration of national labor policy which might accompany the exercise of state jurisdiction." *Sears*, 436 U.S. at 203.

For essentially the same reasons detailed above in the primary jurisdiction analysis, the risk that a state court applying AB 1889 could "misinterpret[ ] . . . federal law," *id.*, is nonexistent in this case. Not only is there no identicality of claims, but the subject matter of an AB 1889 suit is so far removed from the NLRA's primary focus — the determination of what constitutes an unfair labor practice — that any rationale for *Garmon* preemption is absent.

*Sears* itself provides a strong analogy. The Court, after noting the state interest in hearing trespass claims, identified a clear potential overlap between the NLRB's jurisdiction and that of the state court: "[T]he state court was obligated to decide [whether] the trespass was not actually protected by federal law, a determination which might entail an accommodation of Sears' property rights and the Union's § 7 rights. In an unfair labor practice proceeding initiated by the Union, the Board might have been required to make the same accommodation." *Id.* at 201. The Court further noted that the trespass at issue was arguably protected by the NLRA, whereas previ-

---

[4]There is no merit to the Chamber of Commerce's claim that the California statute provides an additional remedy for NLRA violations. The statute's damages provisions are intended to remedy the misuse of state funds under the statute, regardless of whether any NLRA violation has occurred.

ously recognized exceptions to *Garmon* preemption did not "involve[ ] protected conduct." *Id.* at 204. Nevertheless, the Court concluded that the risk that regulation of trespass might impermissibly trench upon the NLRB's jurisdiction over the speech rights of union members was too unlikely to justify usurpation of the state's prerogative. There was no "significant risk of prohibition of protected conduct," so the Court was "unwilling to presume that Congress intended the arguably protected character of the [regulated] conduct to deprive the California courts of jurisdiction to entertain Sears' trespass action." *Id.* at 207.

Here, I have noted the important state interest in determining how its funds are spent. Even if the exercise of this state prerogative could have some effect on the arguably protected advocacy rights of employers, given the nature and functioning of the statute — which has no concern for whether the speech at issue was protected by the NLRA, but only for where the money to fund it came from — there is no "significant risk of prohibition of protected conduct." *Id.* Indeed, the state interest is so strong that we cannot "presume that Congress intended the arguably protected character of the [regulated] conduct to deprive" California of the ability to control the use of its own funds in this manner. *Id.*

## II.    AB 1889 Is Not Wholly Preempted Under *Machinists*

*Machinists* preemption operates as a form of "labor field preemption" — it requires the preemption of any state regulation of activity that although not directly regulated by the NLRA, was intended by Congress "to be controlled by the free play of economic forces." *Machinists*, 427 U.S. at 140 (internal quotation and citation omitted). AB 1889 is best viewed through this lens, because the employer expressive activity at issue is not protected or prohibited by the NLRA, but rather is an essential part of the NLRA's overall labor relations structure.

In enacting a restriction on the use of state funds with the purpose of remaining neutral in labor disputes, California has not intruded on labor relations meant to be left unregulated by the states. The Supreme Court has specifically emphasized the legitimate governmental interest in remaining neutral in labor disputes. *See Lyng v. UAW*, 485 U.S. 360, 371-72 (1988) (holding that a Congress' decision to avoid "subsidization" of striking workers through a food stamp program was legitimately based in Congress's "considered efforts to avoid favoritism in labor disputes"; noting that "we have little trouble in concluding that [the food stamp restriction] is rationally related to the legitimate government objective of avoiding undue favoritism to one side or the other in private labor disputes"). Indeed, state neutrality is not only consistent with the NLRA — it is in many cases *mandated* by the NLRA. Were a state to opt against neutrality by intervening on the side of employer or employee in a labor dispute, such an intervention could itself raise preemption problems. *See Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 619 (1986) ("Even though agreement is sometimes impossible, government may not step in and be a party to the negotiations."). Thus, California's decision to avoid having its own funds used on either side of a labor conflict is clearly legitimate.[5]

Nor does the restriction on the use of state funds interfere with an employer's ability to engage in "self-help" in union organizing in the sense protected by *Machinists.* Restricting the use of the state's funds does not imply an attempt to alter an employer's private decision to support or oppose unionization. An employer who wishes to oppose unionization using its own funds will not suffer any penalty in doing so. It is

---

[5]The majority's extensive arguments as to the "real" purpose of AB 1889 are beside the point. Neutrality means not taking sides. Even if the majority is right that California is effectively preventing employers from using state funds to advocate *against* unionization only, California is still remaining neutral — and it is simply irrelevant whether the money would otherwise be spent to support unionization, oppose it, or in some combination.

ironic that a doctrine meant to ensure that employers can engage in self-help is applied today to force government to help employers oppose unionization.

To be sure, under AB 1889 those employers in California who are currently receiving money from the state will be prevented from using those funds to speak about unionization. Because, according to the Chamber of Commerce, some employers are entirely funded by the state, under the statute some California employers may be prevented from spending any portion of their budgets to advocate during a labor dispute. However, such employers will be prevented from labor advocacy only because they have already chosen to fund their budgets entirely from the state — itself a business decision, and part of the free interaction of market forces that the NLRA is designed to protect.

It is implausible that Congress intended the *use* of state funds to be an area "unregulated because left to be controlled by the free play of economic forces"; state funds are by definition not controlled by the free play of economic forces. *Machinists*, 427 U.S. at 140 (internal quotation marks omitted); *see also Boston Harbor*, 507 U.S. at 225-26. States are not "employers" under the NLRA, and the congressional goal of balancing relations between private employers and employees does not apply to state governments. 29 U.S.C. § 152(2). Addressing only the use of state funds does not address employer behavior in the private marketplace, which is what the NLRA is designed to regulate. *See* Archibald Cox, *Labor Law Preemption Revisited*, 85 Harv. L. Rev. 1337, 1352 (1972) (cited with approval in *Machinists*, 427 U.S. at 140 n.4) ("Two fundamental ideas lie at the core of the national labor policy: (1) freedom of employee self-organization; and (2) the voluntary *private* adjustment of conflicts of interest over wages, hours, and other conditions of employment through the negotiation and administration of collective bargaining agreements.") (emphasis added). Because the statute creates a wall between publically funded activity and private

activity, it does not make sense to hold that the California statute has violated *Machinists* simply by restricting the use of state funds.

The majority's critical error is its conclusion that a state's restricting employers' use of the state's own funds for labor-related advocacy *must* require the conclusion that it is regulating the labor field. This leap of faith is not supported by precedent or logic, and can only be maintained through an unwarranted vision of the statute's meddling effect on labor relations. As to the health and vitality of the labor relations debate itself, there is no evidence in the record that AB 1889's core restriction will do anything to undermine it.

Here is an illustrative example. Imagine that California had a certain amount of money that it wished to grant to hospitals to create more nurse positions. However, California wanted the money to go toward creating nurse positions — not toward funding a campaign to convince the new nurses not to unionize. So long as the recipient hospitals are still free to lobby the nurses to whatever extent they please with their existing treasuries, why should California be forced to fund such lobbying with the money that the state wishes to go toward funding the positions themselves?

The majority, then, has a problem: it purports to rely on the statute's "leverag[ing] of state funds" alone as requiring pre-emption, Maj. Op. at 12182 n.6, but cannot demonstrate how such leveraging alone can have anything but a negligible and incidental effect (at worst) on employer/employee union-related debates. The majority deals with this problem in two ways. First, it relies on the Supreme Court's opinion in *Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282, 289 (1986), for the proposition that just because California "has chosen to use its spending power rather than its police power does not significantly lessen the inherent potential for conflict [with federal labor relations]."

Second, it focuses on the statute's enforcement provisions as having an improper effect on employer speech.

### A.   Gould, Rust *and State Spending Power*

In *Gould*, the Supreme Court found preempted a statute that used a state's spending power to directly regulate labor relations. *Id.* at 291. The statute held that a company found to have violated the NLRA three times within any five year period would be barred from doing any business with the state. In doing so, the statute made an employer's union-related conduct (in this case, whether or not it had violated the NLRA) a condition for the receipt of state funds. If an employer violated the statute, it could not receive the state funds (or, of course, spend them) for any purpose. *Id.* at 283-84.

Likewise, in *Golden State*, the Court found preempted a city's decision to condition renewal of a cab franchise on settlement of a labor dispute. *Golden State*, 475 U.S. at 616-18. Once again, the employer's labor-related activity (in this case, settling a labor dispute) was made a condition for the receipt of state funds. If the employer did not act in the labor arena in the way the city demanded, the employer could not receive the state funding (or franchise). In both cases, the Supreme Court concluded that such conditioning of funds constituted direct regulation of the activity at issue — and was therefore preempted.

If California had made employer neutrality a condition of the *receipt* of state grants or funds — that is, if it had made employer neutrality a condition of doing business with the state — I have little doubt that such a restriction would be preempted by the NLRA. As in *Gould* and *Golden State*, a condition on the receipt of funds would encourage employers to modify the spending of their private funds in labor disputes in order to become eligible for state funding, and would therefore be a transparent effort to use the spending power to "in-

troduce some standard of properly balanced bargaining power" and alter employers' private spending decisions. *Machinists*, 427 U.S. at 149-150 (internal quotation marks and citation omitted).

The California statute at issue here has a crucial difference. A restriction on the *use* of state funds is different from a restriction imposed as a condition for the *receipt* of state funds. In the former instance, the employer has absolute freedom to spend its own funds however it wishes, so long as it does not spend state funds on its union-related advocacy; in the latter, the employer's use of its own funds is curtailed by the restriction. Preventing private employers from using state funds on pro- or anti-union activity does not, in and of itself, undermine the NLRA bargaining process protected by *Machinists*. Such a restriction affects that process only to the extent that it allows the state to maintain its own neutrality even as it funds private employers.

As such, the difference between the statutes at issue in *Gould* and *Golden State* and AB 1889 can be analogized to the circumstances of *Rust v. Sullivan*, 500 U.S. 173 (1991), where the Supreme Court distinguished between statutes that impose conditions on the receipt of state funds from statutes that simply limit the uses to which those funds may be put. *Id.* at 198. I agree with the majority that "the question before us . . . is not whether AB 1889 is consistent with the First Amendment." Maj. Op. at 12205. However, *Rust* is about more than just the First Amendment. It also reveals the Supreme Court's understanding of what constitutes direct regulation through a state's spending power. The Court held in *Rust* that "[b]y requiring that the . . . grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has . . . not denied it the right to engage in abortion-related activities." *Rust,* 500 U.S. at 198. With these words, the Court signaled what the majority misses today: such a restriction on the use of government funds is not direct regulation of the activity. Instead, "Con-

gress has merely refused to fund such activities out of the public fisc." *Id.*

Likewise, here, California has not "denied" employers the "right to engage in [union]-related activity," but "merely refused to fund such activities out of the public fisc." *Id.* This conclusion operates independently of First Amendment doctrine: it simply follows from the Court's observations about what is regulation and what isn't. The issue in *Rust* was whether a statute was invalidated by the First Amendment; here, it is whether a statute is invalidated by federal labor preemption doctrine. These are different inquiries, but they share the same predicate inquiry into what activity is being regulated. In *Rust*, the Supreme Court offered guidance on this separate inquiry, and we should not ignore its obvious relevance here.

The Supreme Court was clear in *Gould* that "[n]o other purpose [than regulating labor relations] could credibly be ascribed [to the statute], given the rigid and undiscriminating manner in which [it] operates: firms adjudged to have violated the NLRA three times are automatically deprived of the opportunity to compete for the State's business." *Gould*, 475 U.S. at 287-88. By contrast, AB 1889 is both flexible and discriminating: it *discriminates* between employers' use of their own funds, which is permitted, and of state funds, which is not; and it allows employers the *flexibility* to use their own funds for union-related advocacy. Further, a very different purpose could credibly be ascribed to it: to help the state remain neutral in labor disputes.

*Rust's* analysis of what kinds of exercises of the state spending power constitute direct regulation of activity is arguably controlling here. At the very least, it illustrates how the majority has misunderstood the nature of the regulation at issue.

### B. *AB 1889's Enforcement Provisions*

The majority further argues that AB 1889's enforcement provisions have effects that require preemption. As I will explain, I agree with several of the majority's conclusions in this regard — but these conclusions provide no basis whatsoever for holding, as the majority has, that the restriction on the use of state funds is itself preempted.

My own analysis leads me to conclude that although AB 1889's core restriction survives preemption, several of its enforcement provisions may in their effect go beyond assuring California's neutrality in labor disputes and instead pressure employers themselves to remain neutral in labor disputes. The majority identifies these problems as well, arguing that "[b]y creating exacting compliance burdens, strict accounting requirements, the threat of lawsuits, and onerous penalties, the statute chills employer speech on the merits of unionism, and adds that "[t]he potential cost of litigation, plus the threat of severe penalties threaten to effectively halt employer campaigns . . ." Maj. Op. at 12178. The majority then details what it considers to be the evils of "the compliance provisions," the "documentation demands" and other enforcement provisions. Maj. Op. at 12179-82.

In certain respects, I share the majority's concerns. Some of the statute's enforcement provisions appear to have an impermissibly intrusive effect on the NLRA's balance of private actions between employer and employee, by exposing employers to the risk of significant litigation costs and punitive sanctions if they support or oppose unionization, even without using state funds.

The majority, however, uses these intrusive effects, which derive solely from a few specific enforcement provisions, as a proxy for finding the entire statute preempted. The majority has held that the restriction on the use of state funds must be preempted, but only marshaled arguments against a narrower

subset of the statute's provisions — those that implement and enforce the restriction.

## C.   Dalton *and Partial Preemption*

"In a pre-emption case such as this, state law is displaced only to the extent that it actually conflicts with federal law. . . . The rule is that a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996) (internal citations and quotation marks omitted). Thus, in order to resolve this case, we have an obligation to determine which parts of the statute are preempted and which are not.

The majority attempts to avoid this obligation by concluding that regardless of how the statute is enforced, "the balance of power as between labor unions and employers would still be improperly disturbed." Maj. Op. at 12198. But how? The majority fails to establish that the restriction on use of state fund is itself preempted. Once one strips from the majority opinion all of its warnings about the effects of the enforcement provisions, there is nothing left to trigger preemption.

Instead, the majority is content to point to vague "risks" — the risk that employers will "be accused of misspending state funds" or "of violating state law."[6] Aside from the few enforcement provisions the majority and I agree upon, these generalized risks are not sufficiently concrete effects to warrant striking down a sovereign act of the state of California — as the Supreme Court has made clear in *Dalton* and before. *See Boston Harbor*, 507 U.S. at 224 (cautioning us to be "reluctant to infer preemption"); *Maryland v. Louisiana*, 451

---

[6]The majority also stresses that employers would suffer the indignity of "need[ing] to maintain [financial] records," something that should not be entirely unfamiliar to private entities that receive money from state coffers.

U.S. 725, 746 (1981) (stating that we must begin any preemption analysis with the "basic assumption that Congress did not intend to displace state law.").

Because I believe only certain enforcement provisions sufficiently risk intrusion into areas preempted under *Machinists*, I would hold that only partial preemption is warranted. On the record before us, however, we are not in a position to determine with certainty which parts of AB 1889 must be found preempted. As made clear by the majority, both in the district court and before us, the parties limited their preemption arguments to discussion of the statute as a whole. It would not be appropriate for us on this record to try to divide the statute's enforcement provisions into preempted and nonpreempted portions. For example, certain enforcement provisions, such as the requirement that employers segregate state and nonstate funds, may be designed to do no more than permit the state to erect a "wall" between state and non-state funds and to enforce a purely compensatory remedy when state funds are misused. To conclude that such provisions are preempted could call into question a state's power to require routine record-keeping requirements that apply in many different contexts to nonprofit corporations and other recipients of state grants.

Even on this record, however, it seems likely that at least some of the enforcement provisions — particularly those that relate to record-keeping — should survive preemption. Therefore, we should leave it to the district court to resolve such questions in the first instance on an appropriate record. We should remand to the district court so the parties can present arguments (and evidence, if necessary) about the separate statutory provisions in light of the preemption principles I have explained today. *See, e.g.*, *Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1283 (9th Cir. 2003) ("Although severability is a question of state law that we review de novo, we nonetheless consider it prudent to remand to the district court where we believe the district court is bet-

ter able to decide the question in the first instance.") (internal quotation marks and citations omitted).

For the reasons set forth above, I respectfully dissent.